UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. CR-04-114(9) (RW) |
| | : | |
| v. | : | |
| | : | |
| RODRIGO TOVAR-PUPO, | : | |
| Also known as "Jorge 40," | : | |
| | | |
| Defendant. | | |

### GOVERNMENT'S MOTION CONCERNING SENTENCING

Comes the United States of America, by and through its undersigned attorneys, and submits the following memorandum concerning sentencing.

### I. Sentencing Recommendation

For the reasons set out below, the United States recommends a sentence of 360 months confinement, five years supervised release, and a fine of $ 1,000,000.

As set forth in greater detail below, the government's sentence is based on the extraordinary amount of cocaine for which the defendant is accountable, as well as the critical leadership position the defendant held in the *Autodefensas Unidas de Colombia* ("AUC"), a terrorist and paramilitary organization in Colombia which became one of the world's largest traffickers of cocaine. During the period when the defendant was one of the main leaders of the AUC, the organization was comprised of thousands of armed paramilitary soldiers, a force largely funded by proceeds from extensive drug trafficking activity. The harm caused by this defendant cannot be underestimated, and further justifies the sentence recommended by the United States.

## II. Procedural Background and Guidelines Range

The defendant and others were charged on June 4, 2004, in a superseding indictment, with conspiracy to manufacture and distribute cocaine, knowing and intending the cocaine would be imported into the United States. On March 2, 2005, a second superseding indictment was returned, charging the defendant and others with the same offense. On June 22, 2009, pursuant to a written plea agreement, the defendant pleaded guilty to conspiracy to manufacture and distribute cocaine, knowing and intending that the cocaine would be imported into the United States, which was Count One of the second superseding indictment. The criminal conduct charged in Count One of the second superseding indictment effectively covers the period from late 1997 to March 2, 2005.

The plea agreement provided that the defendant was accountable for more than 150 kilograms of cocaine, that he should receive a four level upward adjustment based on his role as a leader and organizer, that he should receive a two level increase for possessing a firearm, and that he should receive a one level increase due to the extraordinary quantity of drugs involved in the conspiracy.[1] The presentence report writer, in the revised presentence report published on March 3, 2015, concluded that the defendant had not accepted responsibility, and determined his total offense level to be a level 44 (treated as a 43 under the guidelines), with an advisory guideline range of life. However, pursuant to assurances made by the United States to the government of Colombia when the defendant was extradited[2], the United States stated that it would not seek a life sentence but would instead seek a term of years, and that he would not

---

[1] The factual basis submitted in support of the guilty plea shows that the defendant is accountable for more than 450 kilograms of cocaine, therefore his base offense level is still a level 38.

[2] The defendant's extradition from Colombia to the United States was highly publicized in Colombia. See, for example, *El Tiempo*, 5/21/2008, "The images of 14 men from the paramilitary leadership [including Tovar-Pupo] … climbing the jet bridge stairs to a DEA aircraft … will forever be memorable."

2

receive a life sentence.  Accordingly, the United States would submit that the guideline range for this defendant is 360 months to a term less than life.[3]

As noted in the plea agreement, the government also agreed to recommend that the defendant receive credit for time served since August 16, 2006.  The government also agreed that the sentence imposed in the instant case may run concurrently with any Colombian sentence, although the plea agreement did not bind the government to recommend that his United States sentence would run concurrently to any Colombian sentence received by the defendant.

### III.  The Offense Conduct

#### A.  The Statement of Facts

The Statement of Facts, filed July 22, 2009 and agreed to by the parties, set out in five full pages the offense conduct.  A concise summary of the Statement of Facts shows the following.  By 1996, the defendant became a member of the so called United Self Defense Forces of Campesinos of Cordoba and Uraba (ACCU), an armed para-military group led by Carlos Castaño.  This group operated in northwestern Colombia.  In 1997, Castaño founded the AUC, a federation of para-military groups which included the ACCU and other illegal groups.[4]  One goal of the AUC was to protect Colombian citizens from other armed guerrilla groups (for example, the FARC) seeking to overthrow the government.  The AUC needed money to fund its activities, so, among other illegal acts, it taxed cocaine production and drug trafficking, and provided security to drug traffickers.

By 1999, the defendant had become a leader of the AUC's North Block, conducting the AUC's activities in the Department (state) of Cesar.  Co-defendant Hernan Giraldo Serna was the

---

[3] This assurance is made to all Colombian defendants extradited from Colombia.  In calculating sentences for Colombian defendants, the United States has recommended in other cases a term of years in lieu of a life sentence.
[4] The AUC "became arguably the largest drug trafficking organization in the world….Distinguishing the AUC from drug cartels was its ideological nature [but] the alliances with drug trafficking groups eventually made the AUC indistinguishable from [them]." See http://colombiareports.co/understanding-colombian-conflict-drugs, 1/14/15.

leader of a rival AUC affiliated group, known as the ACMG, which operated in the mountains outside Santa Marta, Colombia. Giraldo Serna also funded his activities by, among other illegal acts, taxing cocaine. In 2001, the defendant began expanding his influence into the region controlled by Giraldo Serna, and to avoid an armed conflict over the taxing of drug traffickers and others, an agreement was reached wherein the AUC's North Block merged with and controlled the former ACMG territory. This newly formed group, called the Tayrona Front, was led by the defendant and Giraldo Serna under a financial arrangement that favored the AUC.

By 2002, the North Block and the Tayrona Front were funding its illegal para-military operations through taxes imposed on cocaine manufacturers and cocaine traffickers operating in the region controlled by the North Block and Tayrona Front. These taxes were implemented by the defendant in his capacity as leader of the North Block following the merger with the ACMG. The region controlled by the defendant contained individuals involved in growing, processing, manufacturing, and transporting cocaine. This cocaine was eventually transported to beaches on the north coast of Colombia.

Once the cocaine was safely transported through territory controlled by the North Block and Tayrona Front, it would be placed on go fast boats off the northern coast of Colombia. The boats were designed to hold up to 2,000 pounds of cocaine at a time. From the north coast of Colombia, some of the cocaine would eventually be shipped to the United States. From 2002 into 2005, the defendant and others with him were involved in the taxation of drug traffickers who used the north coast to launch go fast boats. The AUC imposed taxes of approximately $25,000 (U.S) per boat load, but increased those taxes over time. After the defendant came to lead the North Block/Tayrona Front in 2002, the taxes were paid to him until 2005.

As noted, in exchange for the taxes, the North Block/Tayrona Front also provided security for the drug traffickers.  In the course of carrying out his responsibilities with the AUC, the defendant was supported by an armed security detail, and the defendant himself frequently carried firearms during AUC related activities.  In summary, the defendant knew and allowed that large quantities of cocaine, more than 1500 kilograms of cocaine, were manufactured in and safely stored and transited through the area that his armed group controlled; the defendant knew and allowed that the cocaine labs were permitted to operate and the traffickers were permitted to ship cocaine because of the taxes paid; and the defendant knew and allowed that some of the cocaine was going to the United States.

**B.  The testimony of Nodier Giraldo Giraldo**

Charged in the same superseding indictment, Co-defendant Nodier Giraldo Giraldo (hereafter, Giraldo) pleaded guilty to conspiracy to distribute cocaine, knowing and intending the cocaine would be imported into the United States.  He is pending sentencing.  In a sworn deposition held on  March 23, 2015 and presided over by this court, he testified that he is the nephew of Hernan Giraldo Serna, who commanded the forces of the ACMG until the defendant took over the ACMG territory in 2002.  Giraldo testified under oath that for almost four years beginning in early 2002, Giraldo personally met with the defendant to account for the drug taxes (and other taxes) raised in the region formerly controlled by the ACMG, but now controlled by the defendant's Tayrona Front.

Giraldo further testified under oath that he knew  the defendant was the AUC commander in charge of the region that was formerly controlled by Giraldo's uncle, Hernan Giraldo Serna.  The defendant was subordinate only to the main leaders of the AUC, which included the Castaño brothers and Salvatore Mancuso.  Giraldo usually met monthly with the defendant in the jungle,

5

although sometimes the meetings were held every two or three months.  The defendant was protected by a large security detail and the defendant was often armed when he met with Giraldo.  Their meetings often lasted several hours, during which Giraldo would provide the defendant with a precise accounting of all the money raised from taxing cocaine, from manufacture, to processing, to transportation.  The defendant is the one who directed Giraldo as to how much tax to charge and collect.  Over time, it was the defendant who directed Giraldo, for example, to raise the taxes on the labs, the processers, and the transporters.  The defendant instructed Giraldo to charge the labs and processors in pesos, but to charge an amount calculated in U.S. dollars for those trafficking the cocaine using go fast boats leaving from the north coast of Colombia.

**C.  The testimony of the defendant, Rodrigo Tovar-Pupo**

On March 19 and 21, 2014, the defendant testified under oath as part of his motion to withdraw his guilty plea.  On cross-examination, the defendant described his role with the paramilitary, the size of the force and the land area his forces were active in, and the scope of his taxation of drug trafficking.

The defendant testified that the northern coast of Colombia is made up of seven states, and that seven state territory belonged to the Northern Block of the AUC, which was commanded by Salvatore Mancuso. (TR, 3/21/14, p. 256). The defendant was second in command of the Northern Block. (Id.)   When the defendant first joined the paramilitary effort, he commanded a "very small area," but  by the time he demobilized in 2006, he was in charge of seven different guerrilla fronts in four of the seven states which comprised the Northern Block. (Id. at 255-56).  The defendant explained that the "forces under my command liberated the greatest amount of territory and they were the forces that turned over to the government the greatest area that was free of conflict." (Id. at 256). The defendant estimated that the highest

6

number of soldiers under his authority was about 5,000. (Id.). The defendant compared his forces to a division of the United States Army, in which he served as a one star general with several generals of higher rank above him in his chain of command. (Id. at 259).

The defendant further testified that after he took over the territory of Giraldo-Serna in 2002, "economically speaking, the highest points reached were reached during the years 2002 and 2003 because it was at that point that I was given authority to tax drug trafficking activities in my area, so our income increased tremendously." (Id. at 257). The defendant continued by noting that "in the year[s] 2002, 2003 with this new change and the new income, I was able to triple the size of our combat forces as well as increase the territory under our command." (Id.)

The defendant explained how he started in the paramilitary effort. He explained that he joined a "self defense group" that started in the areas of Cordoba and Uraba, (TR, 3/19/14, pp. 72-73). A "war tax" was imposed on legal and illegal economic activities, and once he determined what economic activities were taking place, the defendant decided "how the taxes would be imposed and how they would be collected within the area" in which he was participating. (Id. at 73-74). The defendant taxed narcotic traffickers in his region. (Id. at 75). He came to realize that "drug trafficking was taking place in, across large swaths of Colombia, and that drug trafficking activities had different sides to them. And each one of these aspects of drug trafficking has to be taxed." (Id. at 75-76). In response to a question by the court, the defendant responded that he knew what the consequences were to the drug traffickers who did not pay the taxes. (Id. at 76).

## IV.  Argument

### A.  Guidelines calculation

The factual basis, the sworn testimony of co-defendant Nodier Giraldo-Giraldo, and the sworn testimony of the defendant show, by at least a preponderance of the evidence, that the defendant was accountable for well over 450 kilograms of cocaine, that the defendant was a leader and organizer of criminal activity that involved five or more participants or was otherwise extensive, and that the defendant possessed a dangerous weapon (a firearm).  Accordingly, the total offense level is a level 44 (treated by the guidelines as a level 43).

In regards to acceptance of responsibility, the defendant has not clearly demonstrated acceptance of responsibility for his offense, as he has repeatedly denied relevant conduct. U.S.S.G. Section 3E1.1, Application Note 1(A).  A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right, and though his original guilty plea might ordinarily be evidence of acceptance, his post-plea conduct outweighs and is inconsistent with acceptance of responsibility.  Application Note 3, Section 3E1.1.  Further, the defendant's post-plea conduct did not permit the government to avoid preparing for trial, and most certainly did not permit the court and the government to allocate their resources efficiently. Section 3E1.1(b), Application Note 6.  The District Court is the best and unique position to evaluate a defendant's acceptance of responsibility.  *In re Sealed Case,* 350 F. 3d 113, 117 (D.C.Cir. 2003).  The adjustment for acceptance of responsibility is generally unavailable to a defendant whose "state of mind- innocence – [is] fundamentally inconsistent with acceptance of responsibility." Id.  A sentencing court  may require a defendant seeking acceptance to candidly acknowledge the circumstances surrounding the offense of conviction.  Id at 123.

The defendant pleaded guilty on July 22, 2009. Nearly two years later, on June 30, 2011, the defendant moved to withdraw his guilty plea. In 2013, the defendant appeared before the District Court and withdrew the motion to withdraw his guilty plea. Sentencing was set for March 7, 2014, but on January 14, 2014, the defendant filed his second motion to withdraw his guilty plea. The District Court conducted five days of hearings later in 2014, at which the defendant testified at length. In essence, the defendant testified that (1) he was innocent of conspiracy to distribute cocaine, knowing or intending the cocaine would be imported into the United States, and (2) his attorney and the government coerced and tricked him into pleading guilty. After the five days of testimony and extensive argument, the District Court concluded that the defendant would not be permitted to withdraw his guilty plea. After the defendant moved to withdraw his guilty plea, the government began preparing for trial. For example, one witness pending sentencing and removal to Colombia was deposed, so that his testimony could be preserved for trial, in the event a trial was ordered. It is clear that the defendant has not accepted responsibility and accordingly, the defendant is not entitled to any adjustment for acceptance of responsibility.

A substantial fine is appropriate. The evidence shows that the defendant received millions of dollars from Nodier Giraldo, and Giraldo was only one of several "tax collectors" who collected money for the defendant. There is no evidence that the defendant disposed of all the money he collected. The absence of any financial information is attributable to his refusal to provide any financial information. The defendant has the burden of showing inability to pay, and he has not done so. *United States v. Sobin,* 56 F.,3d 1423, 1430 (D.C.Cir. 1995).

**B.  3553(a) factors**

Title 18, United States Code, Section 3553(a), lists the factors to be considered in imposing a sentence. From the government's perspective, the most pertinent sentencing factors in the instant case are the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### 1.  Nature of the offense and history of the defendant

The AUC was designated, during pertinent times of the superseding indictment, as a foreign terrorist organization by the United States Department of State. *United States v. Mejia,* 2009 WL 4396858, *1 (D.D.C. April 30, 2009) (unpublished).  The AUC primarily financed its military operations against its rival para-military and leftist guerilla groups and enriched its leaders by producing, selling, and distributing cocaine. *United States v. Perez,* 2014 WL 4979215, *2, n.1 (S.D.N.Y. October 16, 2014).[5]

The defendant was a high ranking commander of the AUC who lead an illegal armed group of more than 1,000 para-military soldiers operating in a substantial portion of northern Colombia.  The defendant controlled the drug trafficking activities in the Department of Cesar, and later expanded his control over the drug trafficking activity in the area formerly controlled by co-defendant Hernan Giraldo-Serna, the area on the north coast of Colombia around the city of Santa Marta and the nearby Sierra Nevada mountains.  A review of the attached map of

---

[5] The AUC maintained close relationships with some politicians and armed forces, as became evident during the unfolding of the "parapolitics" scandal during which more than a third of public officials were investigated for their illegal ties to the paramilitaries.  See:  http://colombiareports.co/understanding-colombian-conflict-drugs.

Colombia shows that, by controlling the activity in the department of Cesar, the critical drug trafficking port of the city of Santa Marta, and the mountains bordering Santa Marta, the defendant controlled the drug trafficking activity of a substantial portion of northern Colombia.

The evidence shows that the defendant was involved in drug trafficking from at least 2002 into 2006, when his armed forces were demobilized, and that even before 2002, he controlled drug trafficking activities within the area in which he operated. Although there is no precise rendering of the amount of cocaine imported into the United States from the defendant's area of command, the evidence shows that the defendant controlled the critical port city of Santa Marta from early 2002 into 2006, and that go fast boats containing upwards of 1500 kilograms of cocaine routinely left from Santa Marta. The defendant collected taxes, calculated in United States dollars, from these go fast loads, and millions of dollars in taxes were collected from the traffickers who directly distributed the go fast loads. It is fair to conclude that the defendant is accountable for a staggering amount of cocaine, an amount well in excess of the threshold amount of 450 kilograms and exceeding the threshold amount by several orders of magnitude.

The defendant employed armed force in controlling drug trafficking in the area in which he and his forces operated in. He was the leader of a terrorist and illegal para-military organization which numbered more than a thousand. He himself was armed and he was protected by a substantial security detail. It would appear that the reason why he needed a security detail was to protect himself from rival illegal para-military and guerilla groups, who also sought to be enriched by drug trafficking activity, other powerful drug traffickers, and from the Colombian Army and law enforcement. The sentencing guideline for possession of a firearm requires that only one firearm be possessed, but here the defendant commanded many armed para-militaries and was armed himself.

The defendant has stated that he bore no ill will against the United States and considered the United States to be an ally, if not a friend.  However, the defendant does not appear to understand or appreciate the magnitude of the harm he caused in the United States, nor has he shown any remorse for the harm he helped to perpetrate.

Given the enormous amount of cocaine for which the defendant is accountable, the length of time he was linked to drug trafficking, and the armed force employed by the defendant as a leader and organizer to pursue and gain his criminal objectives, a sentence of 360 months is entirely appropriate.  The nature and circumstances of the offense, and the history and characteristics of the defendant, including his lack of remorse and acceptance of responsibility, support a sentence of 360 months.

### 2.  Need for sentence imposed to reflect the seriousness of the offense

The sentence imposed should reflect the seriousness of the offense and provide just punishment for the offense.  The defendant pleaded guilty to and the evidence supports conspiracy to manufacture and distribute cocaine, knowing and intending the cocaine would be imported into the United States. The drug trafficking conspiracy to which the defendant is linked was a vast, complex, and ultimately very destructive scheme, and he served a critical leadership role in the conspiracy.  As noted above, a staggering amount of cocaine was distributed, and the defendant's coffers, even if received on behalf of the AUC, netted millions of dollars in drug proceeds.  By the traditional measures employed by the courts to assess the seriousness of the offense – the complexity of the scheme, the amount of cocaine distributed, the amount of money earned, and the harm caused – it is clear that the defendant's crimes were very serious and deserve a serious sentence.

A sentence of 360 months is also just punishment for the offense to which the defendant pleaded guilty. As discussed in detail below, the sentence is consistent with the sentences received by similarly situated defendants in other districts. Further, though a 360 month sentence is much greater than any sentence so far handed down to any of his co-defendants, as discussed below, none of the co-defendants are similarly situated to the defendant. The defendant's critical leadership role in this vast drug trafficking conspiracy, coupled with his lack of remorse and cooperation, separates him from his co-defendants. A sentence of 360 months is at the lowest end of the guideline range closest to the guideline of life in prison, which the government cannot recommend because of its promise to the government of Colombia. For all these reasons, the recommended sentence is just and appropriate punishment.

### 3. Need to avoid unwarranted sentence disparity

The leader of a criminal scheme is not similarly situated to a co-defendant who was not a leader of the criminal scheme. *United States v. Koumbairia,* 501 Fed. Appx. 1, 2013 WL 5977656 (D.C.Cir. 2013). Further, the unwarranted sentence disparity factor set out at Section 3553(a)(6) requires the District Court to avoid unwarranted sentence disparities between similarly situated defendants nationwide, and does not require the court to avoid sentencing disparities between co-defendants who are not similarly situated. *United States v. Balleza,* 613 F.3d 432, 435 (5th Cir. 2010) (sentence disparities between co-defendants who were convicted of different charges or who received departures for substantial assistance are not unwarranted sentence disparities); *United States v. Parker,* 462 F.3d 273, 277 (3rd. Cir. 2006) (the primary goal of Congress in enacting 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case). *Accord, United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Seligsohn,* 981 F.2d 1418, 1428 (3rd Cir. 1992);

*United States v. Verduzco,* 558 Fed.Appx. 562, 568 (6th Cir. 2014); and *United States v. Esso,* 486 Fed.Appx. 200, 201-02 (2nd Cir. 2012). However, although Section 3553(a)(6) does not require district courts to consider sentencing disparity among co-defendants, it does not prohibit them from doing so. *Parker,* 462 F.3d at 277.

There are other AUC commanders whose cases, some in the District of Columbia and some in other districts, are relevant to consider in assessing an appropriate sentence for this defendant. Salvatore Mancuso was the highest ranking AUC leader to be extradited to the United States. Mancuso was a member of the ruling committee of the AUC, and like the defendant Tovar Pupo, Mancuso commanded his own block or front of the AUC. Mancuso was Tovar Pupo's immediate superior. There were other defendants who were extradited to the United States who, similar to the defendant, were AUC commanders who commanded a sizeable illegal armed force that controlled a large, strategic area of northern Colombia, and therefore controlled the drug trafficking activity in that area. The following AUC commanders also commanded a sizeable armed force which controlled territory and dominated drug trafficking activity in their territory, and then themselves became drug traffickers: the aforementioned Giraldo-Serna, Miguel Mejia-Muñera, Carlos Jimenez-Naranjo, and Ramiro Vanoy-Murillo. Another similarly situated defendant would be Diego Murillo-Bejarno (alias "Don Berna"), who played a key leadership role in the AUC but did not command armed forces. Murillo-Bejarno (alias "Don Berna") was a powerful "inspector general" for the high level AUC leadership, and exercised significant influence over the drug trafficking activity of the AUC.

The cases involving Mancuso, Giraldo-Serna and Mejia-Muñera are all in the District of Columbia, and none of them have been sentenced. Mancuso's sentencing hearing is now scheduled for May 7, 2015 before the Honorable U.S. District Court Judge Ellen S. Huvelle, and

Mejia-Muñera is pending sentencing before the Honorable U.S. District Court Judge John D. Bates. Giraldo-Serna is before this Honorable District Court and no sentencing date has yet been scheduled.

Jimenez-Naranjo was the commander of the Central Bolivar Block, commanding an estimated 7,000 armed combatants. He was sentenced on May 9, 2011, to 396 months confinement after guilty pleas to drug trafficking, engaging in drug trafficking with the intent to provide something of value to a terrorist organization (the AUC), and to violating the maritime statute by transporting cocaine using maritime vessels subject to the jurisdiction of the United States (Case Number 07-20794, SDFL).[6] Vanoy-Murillo, and AUC leader, pleaded guilty to drug trafficking and on October 15, 2008, was sentenced to 293 months confinement (Case Number 99-06153, SDFL). He was the commander of the AUC Bloque Mineros which operated in Antioquia and Cordoba.[7] On April 22, 2009, Murillo-Bejarno, the "inspector general" for the AUC, was sentenced to 375 months confinement and a $4 million fine for drug trafficking (Case Number 03-01188, SDNY).[8] His plea agreement included a stipulated sentencing guidelines range of 324 months to 405 months. The sentences received by Jimenez-Naranjo, Vanoy-Murillo, and Murillo-Bejarno were not impacted by U.S.S.G. Section 5K1.1 or Title 18, United States Code, Section 3553(e).

Other AUC commanders who would be similarly situated to the defendant, such as Julian Bolivar, Ramon Isaza (alias "El Aleman"), and brothers Fredy Rendon-Herrera and Daniel Rendon-Herrera (alias "Don Mario"), though indicted in the United States for drug trafficking, are still pending extradition.

---

[6] Jimenez-Naranjo pleaded guilty in the District of Columbia to the first two offenses noted. His two cases were consolidated for sentencing in the SDFL.
.
.

Further, none of the co-defendants in the defendant's case, including Hernan Giraldo-Serna, are similarly situated to the defendant and none of the co-defendants could be meaningfully compared to the defendant (except for Giraldo-Serna).  Of the 15 co-defendants listed on page two of the presentence report, 12 were extradited to the United States, and most but not all of the 12 came to the District of Columbia.  None of the co-defendants (except for Giraldo-Serna) was a commander of armed forces or controlled territory at the level of the defendant or any of the commanders noted above.  The co-defendants were at various levels below the defendant and Giraldo-Serna, and though most of the co-defendants served critical roles in the conspiracy, none played a role that could compare in any way to the defendant. Nine of the co-defendants have been sentenced for drug trafficking, either in the District of Columbia or the Middle District of Florida, and their sentences ranged from 56 months to 144 months. One co-defendant received a minor role adjustment, several were safety valve eligible, and one pleaded guilty only to money laundering (and he is still pending sentencing).  In a separate filing, the government will provide the District Court with a more detailed assessment of all the co-defendant's cases.

The government submits that there are no unwarranted sentencing disparities between the defendant and any of the co-defendants who have been sentenced.  In addition, consistent with the Congressional goal of national sentencing uniformity in passing Section 3553(a)(6), the District Court should sentence the defendant consistently with the similarly situated defendants Jimenez-Naranjo, Vanoy-Murillo, and Murillo-Bejarno, who were elite leaders in the AUC and who pleaded guilty to drug trafficking offenses. Their sentences ranged from 293 months to 396 months.  The government's sentencing recommendation of 360 months is consistent with the sentences received by these similarly situated defendants, especially considering those

16

defendants were found to have accepted responsibility for their criminal offenses and relevant conduct.

### D. Other Considerations

After the defendant demobilized but before he was extradited in 2008, the defendant met several times with Colombian officials in the Justice and Peace program.[9] The purpose of the meetings was for the defendant and the Colombian officials to determine if the defendant sought to receive the benefits of the Justice and Peace program by voluntarily agreeing to cooperate with Colombian authorities. The defendant denied any personal responsibility for any wrongdoing, but accepted command responsibility for some acts of wrongdoing. After the defendant was extradited, he declined to have any further contact with the Justice and Peace program.

After the defendant pleaded guilty, he was interviewed several times by United States prosecutors and agents. The defendant provided some information about another AUC defendant. The government conveyed to the attorney for the other AUC defendant that the defendant (Tovar-Pupo) was purportedly willing, at that time, to testify against the attorney's client. After weighing the totality of the evidence against him, of which the defendant was a part, that other AUC defendant eventually pleaded guilty.

In the view of the government, the defendant did not provide full and complete substantial assistance in the investigation or prosecution of another person who has committed an

---

[9] A summary of the Justice and Peace process is at the website for The Center for Justice and Accountability, at http://cja.org/article.php; and, Lisa Laplant and Kimberly Theidon, "Transitional Justice in Times of Conflict: Colombia's Ley de Justicia y Paz," 28 Mich.J.Int'l L. 49, 63-64 (Fall 2006).

offense. Accordingly, the government does not intend to file a motion pursuant to U.S.S.G. Section 5K1.1.

## CONCLUSION

Accordingly, for the reasons set out above, the United States moves the District Court to sentence the defendant to 360 months confinement. Such a sentence is appropriate and by no means excessive when measured against the magnitude of the defendant's convicted offense and relevant conduct.

Respectfully submitted,

ARTHUR G. WYATT
CHIEF
NAROTIC AND DANGEROUS DRUG SECTION

_____-s-_____
Paul W. Laymon
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice
145 N Street NE
Washington, D.C. 20005
Phone 202-514-1286
paul.laymon@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a copy of this response was sent via e-mail to defense counsel on April 6, 2015.

\_\_\_\_-s-_____
Paul W. Laymon