UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
AUG - 7 2015
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal Action No. 04-114-1 (RBW) |
| | ) |
| HERNAN GIRALDO-SERNA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

In this criminal matter, the defendant, Hernan Giraldo-Serna, was indicted on, and pleaded guilty to, one count of conspiring to manufacture and distribute five or more kilograms of cocaine, with the intent or knowledge that the cocaine would be unlawfully imported into the United States from Colombia. Zulma Natazha Chacín de Henríquez, Nadiezhda Natazha Henríquez Chacín, and Bela Henríquez Chacín (collectively, the "movants"), have filed a motion, contending that the defendant killed their father, Julio Henríquez, in furtherance of the defendant's charged offense, and thus, their father is a "victim" of the charged offense, and they are entitled to statutory rights provided by the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771 (2006).[1] Motion to Enforce Rights Under the Crime Victims' Rights Act by Zulma Natazha Chacín de Henríquez, Nadiezhda Natazha Henríquez Chacín and Bela Henríquez Chacín ("Movants' Mot.") at 1-8. After careful consideration of the submissions on this issue,[2]

---

[1] The statute provides, in part, that "[i]n the case of a crime victim who is . . . deceased, the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights . . . ." 18 U.S.C. § 3771(e).

[2] In addition to the movants' motion, the Court considered the following submissions in rendering its decision: (1) the Response of the United States to Order to Show Cause in Connection With Motion to Enforce Rights Under the Crime Victims' Rights Act ("Gov't Resp. I"); (2) the Movants Zulma Natazha Chacín de Henríquez, Nadiezhda Natazha Henríquez Chacín, and Bela Henríquez Chacín['s] Opposition Memorandum in Support of Motion to Enforce Rights Under the Crime Victims' Rights Act ("Movants' Opp'n"); (3) the Movants' [Crime Victims' Rights
(continued . . .)

1

as well as the parties' oral arguments at the April 21, 2015 hearing, the Court concludes that it must deny the motion.[3]

## I. BACKGROUND

### A. Statutory Background

The CVRA guarantees to the victims of federal crimes an array of substantive and participatory rights, namely:

> (1) The right to be reasonably protected from the accused[;]
> (2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused[;]
> (3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding[;]
> (4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding[;]

---

(. . . continued)
Act] Submission in Connection With Status Conference Scheduled for February 18, 2015 ("Movants' Submission I"); (4) the Defendant's Opposition to Motion to Intervene Under Crime Victims' Rights Act ("Def.'s Opp'n"); (5) the Movants' Further [Crime Victims' Rights Act] Submission in Connection With Status Conference Scheduled for February 18, 2015 ("Movants' Submission II"); (6) the Amended Response to [Crime Victims' Rights Act] Submission in Connection with Status Conference ("Gov't Resp. II"); (7) the Movants' Further Submission in Support of Their Motion to Enforce Rights Under the [Crime Victims' Rights Act] ("Movants' Submission III"); (8) the Defendant's Reply to Motion to Intervene Under Crime Victims['] Rights Act ("Def.'s Reply"); and (9) the Response to Further Submission in Support of [Crime Victims' Rights Act] Motion ("Gov't Resp. III").

[3] The movants complained that they cannot access certain documents on the defendant's docket that would bolster their arguments in support of their motion. See Movants' Submission III at 1 n.1. The Court notes that it has now unsealed the defendant's docket, see May 29, 2015 Order, ECF No. 501 (ordering "that the entire docket for defendant Hernan Giraldo-Serna only be unsealed"), and if administrative impediments prevented the movants from accessing certain documents, they should have brought those issues to the Court's attention well before any submission regarding their motion was due. See Movants' Submission III, Declaration of Yolanda Gutierrez-Almazan in Support of Movants' Further Submission in Support of Their Motion to Enforce Rights Under the CVRA ("Gutierrez-Almazan Decl.") ¶ 3 ("The clerk also informed me that the attorneys would have to file a motion for limited access with the [Court] in order to gain access to the [sealed] documents for their review."). And to the extent that certain documents may still be inaccessible, the movants have previously been made aware that if documents on the defendant's docket contain information regarding certain co-defendants—some whose cases still remain under seal—those documents would not be unsealed. See id. ("I was told by the clerk that the initial indictment and any other document not available on Pacer were likely still sealed because they involved other [d]efendants whose cases have not been unsealed yet."). Movants took no exception to the Court's handling of such documents. In any event, given the Court's familiarity with this case, it cannot see how any other documents can be relevant to the resolution of the movants' motion.

2

> (5) The reasonable right to confer with the attorney for the Government in the case[;]
> (6) The right to full and timely restitution as provided in law[;]
> (7) The right to proceedings free from unreasonable delay[;] and
> (8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

18 U.S.C. § 3771(a)(1)-(8). "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded" these rights. Id. § 3771(b)(1). A "crime victim" is defined in the CVRA as "a person directly and proximately harmed as a result of the commission of a [f]ederal offense . . . ." Id. § 3771(e).

### B. The Defendant[4]

During the relevant timeframe, the United Self-Defense Forces of Colombia (the "AUC") "was a federation of right-wing, paramilitary groups" that undertook "responsibility for protecting Colombian citizens from left-wing, guerilla paramilitary organizations dedicated to the overthrow of the Colombian government." Statement of Facts ¶ 1. One such group within the AUC, the Self-Defense Forces of the Campesinos of Magdalena and Guajira ("ACMG"), was led by the defendant. Id. The ACMG would later merge with another paramilitary group and would come to be known as the "Bloque Tayrona" or the "Tayrona Resistance Front." Id. The Bloque Tayrona "operated along the northern Caribbean coast of Colombia," id., and "controlled areas . . . used by individuals involved in the growing, processing, manufacturing, and transportation of cocaine," id. ¶ 2. "This cocaine would eventually be transported to beaches on the northern coast of Colombia." Id. Once the cocaine reached the northern coast of Colombia, it "would be placed into so-called 'go-fast' boats," and "[t]he go-fast boats would leave . . . for

---

[4] For purposes of this motion, the Court has considered the facts set forth in the Statement of Facts, which were agreed to by the United States and the defendant and used in support of the defendant's guilty plea. See 18 U.S.C. § 3771(d)(6) ("Nothing in this statute shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction.").

destinations in the [Caribbean], Central America[,] and Mexico." Id. ¶ 3. "The cocaine was then received by other drug trafficking organizations in those regions, and later shipped to the United States . . . ." Id.

The Bloque Tayrona, "[i]n large part, . . . funded its anti-guerilla operations through 'taxes' imposed by the defendant on cocaine manufacturers and traffickers operating" in the areas that it controlled. Id. ¶ 2. These "war taxes," id. (internal quotation marks omitted), would be paid "[a]t the time the loads [of cocaine] were launched" from the coast, id. ¶ 5. In exchange for these taxes, the Bloque Tayrona "ensured that traffickers were not molested by left-wing[,] paramilitary groups or other criminal elements, and would keep a lookout for law enforcement presence in the area." Id. ¶ 6. "As part of this security, the defendant . . . would coordinate and make arrangements . . . to ensure that . . . troops would be present in the area to provide additional perimeter security during the actual loading of cocaine into the go-fast boats; to perform surveillance on Colombian law enforcement authorities and rival drug trafficking groups; and to monitor and relay communications within various units of the . . . Bloque Tayrona." Id.

In March 2005, the grand jury charged the defendant in a superseding indictment with one count of conspiracy to manufacture and distribute five kilograms or more of cocaine, intending and knowing that the cocaine would be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), 963. March 2, 2005 Second Superseding Indictment ("Indictment") at 1-3; see also Def.'s Opp'n at 2; Gov't Resp. II at 1. Colombia extradited the defendant to the United States in 2008, and he eventually pleaded guilty to the conspiracy charge in January 2009. Gov't Resp. II at 1.

## C. The Decedent

On February 4, 2001, Julio Eustacio Henríquez Santamaría ("Henríquez") attended "a meeting" in Santa Marta, a city along the northern coast of Colombia, with other members of "Madre Tierra," an "association [Henríquez] had founded." Gov't Resp. I, Exhibit ("Ex.") 7 (English Translation of January 2009 Republic of Colombia Criminal Court Opinion ("Columbian Opinion")) at 4; see also id. at 1; Gov't Resp. I, Ex. 6 (English Translation of March 2007 Colombian Prosecutor Statement ("Colombia Prosecutor Statement")) at 1. Through this organization, Henríquez sought to organize local farmers and encourage them to use their "properties for cacao crops, in an attempt to eradicate the coca crops." See Gov't Resp. I, Ex. 6 (Colombia Prosecutor Statement) at 1-2; see also id. at 19 ("project had two goals, first reforesting a part of the mountains with cacao crops in order to help the farmers financially because [Henríquez] had a lot of experience producing cacao and wanted to help many people in the area with it[,] [and second], he wanted the area to be a definite tourist destination for visits to indigenous farming areas and an ecological project because he had always loved the land and wanted to preserve it"); id. at 21-22, 23. On the same day as the meeting, Henríquez was kidnapped by paramilitary forces under the direction of the defendant. Id. at 2, 4, 5, 12, 14, 15. Henríquez was never seen again. Id. at 14.

The circumstances surrounding Henríquez's disappearance were investigated by a Santa Marta Prosecutor. See id. at 1-2, 36. The prosecutor concluded that the defendant abducted and killed Henríquez for several reasons. First, the defendant "disagreed" with the objectives of Henríquez's "Madre Tierra" association. See, e.g., id. at 10, 22, 24, 26, 31; Gov't Resp. I, Ex. 8 (English Translation of Declaration of Carmelo Sierra-Urbina ("Sierra-Urbina Decl.")) at 5. Second, the defendant had previously told Henríquez to leave the Santa Marta area, but "he

never obeyed the order to leave . . . ." Gov't Resp. I, Ex. 6 (Colombia Prosecutor Statement) at 2; see also id. at 17, 28, 30-31, 34, 35, 45; Ex. 8 (Sierra-Urbina Decl.) at 1, 6. Third, Henríquez was a former member of "M-19," a guerilla group, who had been reincorporated into civil society. See Gov't Resp. I, Ex. 6 (Colombia Prosecutor Statement) at 13, 20, 21, 22, 31, 32, 33; see also id. at 24 (Henríquez received "threats" from the defendant as a result of "his work as a peace messenger" in the Santa Marta area); id. at 26 (Henríquez "had been executed because apparently he had been reincorporated into civil society from a subversive group"); Ex. 8 (Sierra-Urbina Decl.) at 9. Many years later, a Colombian criminal court held the defendant accountable for the disappearance and death of Henríquez, Gov't Resp. I, Ex. 7 (Columbian Opinion) at 14, and confirmed the Santa Marta prosecutor's findings as to why the defendant killed him, see id. at 1, 3, 5, 6, 7, 12, 14. In light of Henríquez's death, the movants seek to enforce what they believe are their statutory rights afforded to victims under the CVRA. Movants' Mot. at 1-8. They sought intervention in this matter in April 2010, after the defendant entered his guilty plea. Movants' Opp'n at 10. The United States and the defendant oppose the motion.

## II.   ANALYSIS

The heart of the dispute underlying the pending motion is the scope of the defendant's charged criminal conduct in this case that must be considered in determining whether Henríquez was directly and proximately harmed by that conduct. See, e.g., Movants' Opp'n at 12-13; Movants' Submission I at 3-4, Movants' Submission II at 8. The defendant and the government insist that the Court need look no further than the elements of the offense for which the defendant accepted a guilty plea to determine the relevant criminal conduct under the CVRA. Def.'s Opp'n at 3-9; Gov't Resp. II at 4. The movants, on the other hand, urge the Court to dig deeper and scrutinize "how the conspiracy was actually committed," in assessing whether they

qualify as victims under the CVRA. Movants' Submission I at 5. The Court need not resolve that dispute, as either approach yields the same result.

Purported victims under the CVRA must prove their victim status by a preponderance of the evidence. See In re McNulty, 597 F.3d 344, 351 (6th Cir. 2010) (citing United States v. Johnson, 440 F.3d 832, 835-39, 849-50 (6th Cir. 2006)); United States v. Atl. States Cast Iron Pipe Co., 612 F. Supp. 2d 453, 524-25 (D.N.J. 2009). To determine whether an individual qualifies as a crime victim under the CVRA, courts must identify: (1) "the behavior constituting [the] 'commission of a [f]ederal offense'"; and (2) "the direct and proximate effects of that behavior on parties other than the United States."[5] In re Stewart, 552 F.3d 1285, 1288 (11th Cir. 2008) (quoting 18 U.S.C. § 3771(e)) (footnote omitted); see also In re McNulty, 597 F.3d at 351 ("In making this determination, . . . [courts] must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of that [f]ederal offense.'" (quoting Atl. States Cast Iron Pipe Co., 612 F. Supp. 2d at 536) (alteration omitted)). The CVRA "instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties." In re Stewart, 552 F.3d at 1289. "If the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA." Id. at 1288. "Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." Id. at 1289.

---

[5] The District of Columbia Circuit has yet to weigh in on the issue of how courts in this Circuit should assess whether an individual qualifies as a "crime victim" under the CVRA. But the parties do not dispute that this two-step inquiry outlined in In re Stewart is the appropriate test to employ. See, e.g., Movants' Opp'n at 11; Def.'s Opp'n at 6, 8; Gov't Resp. II at 3-4.

"The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." In re Rendon Galvis, 564 F.3d 170, 175 (2d Cir. 2009) (citing In re Antrobus, 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring)); see also In re Fisher, 640 F.3d 645, 648 (5th Cir. 2011) ("The CVRA's 'directly and proximately harmed' language imposes dual requirements of cause in fact and foreseeability. A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm. A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." (footnotes omitted)); United States v. Monzel, 641 F.3d 528, 537 (D.C. Cir. 2011) ("Proximate cause ensures 'some direct relation between the injury asserted and the injurious conduct alleged.'" (quoting Hemi Group, LLC v. City of New York, 559 U.S. 1, 9 (2010))); In re McNulty, 597 F.3d at 352 ("direct" harm element "requires that the harm to the victim be closely related to the conduct inherent to the offense, rather than merely tangentially linked" (emphasis added)); United States v. Sharp, 463 F. Supp. 2d 556, 568 (E.D. Va. 2006). "The necessary inquiry is a fact-specific one." In re Rendon Galvis, 564 F.3d at 175.

Here, neither the Indictment charging the defendant with conspiracy nor the Statement of Facts in support of the defendant's plea agreement makes reference to the defendant using force or violence in furtherance of the charged conspiracy. The defendant pleaded guilty to a lone count of conspiracy to manufacture and distribute five kilograms or more of cocaine, knowing or intending that it would be unlawfully imported into the United States. Plea Agreement ¶ 1. The essential elements of this offense are: (1) that there was "an agreement . . . between two or more people to distribute cocaine for the purpose of unlawful importation into the United States; [2] that . . . [the] defendant knowingly and [willfully] joined in that conspiracy; and [3] that . . . [the]

defendant intended or knew that such cocaine was to be unlawfully imported into the United States." United States v. Mejia, No. 99-cr-389(RWR), 2002 WL 33929076, at *5 (D.D.C. May 14, 2002); see also United States v. Borda, 786 F. Supp. 2d 25, 41 (D.D.C. 2011) (same). There is no element in the charged conspiracy that requires an act of force or violence, and the movants do little to argue otherwise.[6] See Movants' Submission I at 3 ("the use of violence or force is not itself an element of the conspiracy offense"); see also Sharp, 463 F. Supp. 2d at 564 ("The specific conduct underlying the elements of conspiracy to possess with intent to distribute marijuana that were the basis for the [d]efendant's offense of conviction does not include assault and battery, or any other violent conduct."). The only conduct underlying the defendant's charged conspiracy is the "formation" of an "unlawful agreement to import" cocaine into the United States through the collection of taxes assessed against others actually engaged in the manufacture and importation of cocaine. E.g., United States v. Cobar, No. 05-cr-451(RCL), 2006 WL 3289267, at *2 (D.D.C. Nov. 9, 2006); see also Movants' Opp'n at 13 ("agreement with intent").

And further examination of the defendant's criminal conduct that formed the basis for the conspiracy fails to bridge the gap in causality between Henríquez's death and the charged conspiracy. To carry out the conspiracy, the grand jury and the government alleged and the defendant admitted, that the defendant imposed "war taxes" on cocaine manufacturers and

---

[6] Only after several filings in support of their motion, do the movants even attempt to argue in the alternative, i.e., that even if the approach advanced by the government and the defendant were correct, the movants are still entitled to victim status under the CVRA. See Movants' Submission II at 8 ("The [d]efendant's behavior in causing . . . Henríquez[']s death was in furtherance of the conspiracy. Evidence of his killing establishes an essential element of the conspiracy, its object."); see also Sharp, 463 F. Supp. 2d at 564 n.16 (explaining that in the context of a conspiracy, a "crime victim" may also include one who "was harmed by an act taken in furtherance of the conspiracy," but that "to qualify under this standard, the act taken in furtherance of the conspiracy must be 'specifically included as an element of the offense of conviction'" (quoting United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996))). But neither force nor violence is an element of the object of the conspiracy charged in this case. And as the Court will explain, there is insufficient evidence that the defendant furthered the charged conspiracy by killing Henríquez.

traffickers, who sought to import cocaine into, among other places, the United States; and in return, the defendant provided protection from other paramilitary groups, criminal bands, or Colombian law enforcement. Statement of Facts ¶¶ 2, 5, 6. Neither the government nor the defendant has suggested that the conduct in furtherance of the conspiracy is anything more than what has already been admitted to by the defendant in his Statement of Facts in support of his guilty plea.[7] See In re McNulty, 597 F.3d at 351 (explaining that courts "look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant" when identifying the relevant federal offense under the CVRA (emphasis added)); see also Movants' Opp'n at 13 (citing In re Stewart, 552 F.3d at 1288, and requesting the Court to "look[] at how the offense is factually alleged"). In other words, it is not alleged by the grand jury or the government, or acknowledged by the defendant, that he furthered the charged conspiracy through the use of either force or violence in the manner suggested by the movants. It follows that there is no basis for the Court to find that either force or violence was employed by members of the conspiracy in furtherance of the charged offense. Thus, the death of Henríquez can be neither the direct nor the proximate harm of the charged offense in this case.[8] See United States v. Credit Suisse AG, No. 14-CR-188, 2014 WL 5026739, at *4 (E.D. Va. Sept. 29, 2014) (finding no crime victim status under the CVRA where the "conduct underlying [the defendant's] guilty plea in [the] case" was "neither the but-for cause nor the proximate cause of [purported victim's] harm").

---

[7] And the Indictment is silent on the matter.

[8] In light of the Statement of Facts, the Court notes that the movants would have a stronger argument for victimhood status if, for example, Henríquez had fallen victim to crossfire while the defendant provided security protection for cocaine manufacturers and traffickers, who were intending to import five or more kilograms of cocaine into the United States. If Henríquez came to his death under such circumstances, it would likely be appropriate for the Court to find that he was a victim that was directly and proximately harmed by the charged conspiracy. See, e.g., Sharp, 463 F. Supp. 2d at 565 ("the closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists").

The movants claim that "[i]t was the 'protection' of the trafficking activity provided by [the] [d]efendant that caused him to order the murder of . . . Henríquez." Movants' Submission III at 5. But, as presented in the movants' many submissions, Henríquez was not murdered because he inhibited trafficking activity; rather, it was his opposition to the cultivation of coca crops. As the defendant correctly observes, there is "no mention in the agreed[-]upon facts—directly, indirectly[,] or otherwise—of the [defendant] providing protection for the cultivation of [coca crops] . . . and no reference to the [charged] conspiracy taking affirmative violent actions against anyone who opposed [such] cultivation." Def.'s Reply at 3; see also id. at 4 ("[T]his Court would have to unilaterally amend the Superseding Indictment by adding as a conspiratorial objective the murder of anyone opposed to [coca crop] cultivation.").

In an attempt to show that Henríquez was directly and proximately harmed by the defendant's charged conspiracy, the movants purportedly advance proof suggesting that the defendant used force and violence to advance the charged conspiracy. See, e.g., Gov't Resp. 1, Ex. 6 (Colombia Prosecutor Statement) at 16 (Henríquez's widow suggesting that the creation of "Madre Tierra" "could have been the reason for her husband's disappearance" because that "project created resentment in the paramilitary because the land had been abandoned and was planted with coca [crops]"); see also Gov't Resp. I, Ex. 7 (Colombian Opinion) at 3, 5 (similar). But the Court finds their proffers insufficient.

First, as alluded to earlier, neither the Indictment nor the Statement of Facts states that the defendant used force or violence to further the conspiracy, let alone in the manner suggested by the movants. The fact that the government did not allege additional or alternative factual bases for the charged conspiracy may distort the scope of the conspiracy, but it is not the Court's prerogative to expand that scope beyond what the grand jury concluded the government could

prove. See Credit Suisse AG, 2014 WL 5026739, at *4 ("Although a person seeking to assert victimhood status may believe that a defendant should have been charged with an additional or different crime, the CVRA clearly states that '[n]othing in this statute shall be construed to impair the prosecutorial discretion' of the United States." (quoting 18 U.S.C. § 3771(d)(6)) (alteration omitted)). The Court can only assess the direct and proximate effects of the offense charged by the government and admitted to by the defendant. See In re McNulty, 597 F.3d at 351 (explaining that courts "look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant" when identifying the relevant federal offense under the CVRA (emphasis added)); In re Local #46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds, 568 F.3d 81, 87 n.3, 88 (2d Cir. 2009) (finding no victim status under the CVRA where, inter alia, the movant was "asserting victim status based on . . . acts that are different from, and outside of, the charged activities"); In re Stewart, 552 F.3d at 1288 ("The question the [CVRA] petition presents is whether petitioners are victims of the criminal conduct as described in the information pending in the district court.").

Second, even if the Court could consider the movants' purported proof, that information also suggests that the defendant employed force and violence for reasons unrelated to the charged conspiracy, see In re Fisher, 649 F.3d at 403 ("An act is a but-for cause of cause of an event if the act is a sine qua non of the event—if, in other words, the absence of the act would result in the non-occurrence of the event. Conversely, an act is not a but-for cause of an event if the event would have occurred even in the absence of the act."); id. at 404 (courts "must ask what would have happened if there had been no conspiracy at all" because "[a] crime is a but-for cause of an injury only if the injury would not have occurred in the absence of the crime"); In re McNulty, 597 F.3d at 352 (direct harm where harm is "closely related to the conduct inherent to

the offense, rather than merely tangentially linked" (emphasis added)), such as the use of fear or intimidation to maintain control and influence over the areas controlled by the Tayrona Bloque, see, e.g., Gov't Resp. I., Ex. 7 (Colombian Opinion) at 1 (summarizing reasons why defendant killed Henríquez); id. at 12 ("It was said that the person taken away was a former member of M-19[,] who had been reintegrated into civil society, making this perhaps one of the motives for [Henríquez's] disappearance. . . . Now, it is a mystery to no one that there are outlaw groups present . . . [that have] put the community in a state of nervousness and anxiety due to the military, economic, and even political power they have come to achieve. These criminal organizations operate under the command of the [defendant,] who, together with his collaborators, were conspiring to commit multiple atrocious crimes. Logically, no one would dare to denounce them, under penalty of suffering the same fate that befell . . . [Henríquez] . . . ."); id. at 14 ("[Henríquez] had to be disappeared at all costs since he was impeding the objectives of the AUC to continue planting coca,[9] which Henríquez wished to see eradicated in order to cultivate cacao. This was not permitted by [the defendant,] who, in revenge and with malice[,] decided . . . to make Henríquez . . . disappear. . . . Even so, the fact that Henríquez . . . was a former member of M-19[,] who had been reintegrated into civil society[,] constituted another motive for his execution, as the evidence shows that it was considered a bad thing for a former guerilla to be gaining influence and even more so in an area under paramilitary influence.");[10] see also Gov't Resp. I., Ex. 6 (Colombia Prosecutor Statement) at 12 ("[T]he

---

[9] This is not the objective of the charged conspiracy, which was the unlawful importation of cocaine into the United States.

[10] Absent from the movants' arguments or supporting information is any indication that the coca crops that Henríquez sought to "eradicate[]," Gov't Resp. I, Ex. 7 (Colombian Opinion) at 14, were to be converted into cocaine for the purpose of importation into the United States. Such evidence is necessary because the government charged the defendant with a conspiracy to manufacture and distribute five kilograms or more of cocaine, knowing or intending that it would be unlawfully imported into the United States. 18 U.S.C. § 3771(e) (defining crime victim
(continued . . .)

paramilitaries were afraid of [Henríquez] because he was a leader in the area; he had always been a leader, leadership was in his blood, for that reason they were afraid of him and maybe that was the reason for his disappearance."); id. at 13 ("[Henríquez's daughter] knows . . . [the kidnappers] are the paramilitary because of what is said in the region and no one can go in there without permission from that group. In addition, she says her father was granted amnesty in 1984 for having been a member of the M-19 and he had received a farm and since that time he has gotten to know fishermen in the region and he had many people on his side, a circumstance that must have looked bad to the paramilitary."); id. at 14 ("[T]he Ombudsman of the city of Santa Marta who conducted inquiries with [the defendant] and that he had told her that in fact he had killed [Henríquez] . . . arguing that he had many reasons for doing so." (emphasis added)); id. at 18 ("From the statement of the Ombudsman we learn that in fact those responsible for the disappearance of [Henríquez] did present their supposed reasoning for committing that crime—his possible association with the guerilla groups in the region."); id. ("Henríquez had been executed because apparently he had been reincorporated into civil society from a subversive group."); id. at 20 (suggesting that Henríquez was killed because he did not obey the defendant's multiple warnings to leave the Santa Marta area); id. at 21-25, 27. In light of these acknowledged alternative motives for Henríquez's death, the Court cannot find by a preponderance of the evidence that the charged conspiracy was a but-for cause of his death, let alone a "substantial factor," as opposed to a possible factor, that caused the defendant to kill Henríquez. See Sharp, 463 F. Supp. 2d at 567 ("Nor is there evidence tending to suggest that the [d]efendant's conspiracy was a substantial factor in causing [the victim]'s alleged harm. [The

---

(. . . continued)
as "a person directly and proximately harmed as a result of the commission of a [f]ederal offense" (emphasis added)). The defendant was neither charged with nor could he have been charged in the United States with a conspiracy to import cocaine into any country other than the United States.

victim] must show more than a mere possibility that an alleged act (the [d]efendant's federal crime) caused her . . . [the alleged harm]."); see also Monzel, 641 F.3d at 537 (proximate cause exists where there is "some direct relation between the injury asserted and the injurious conduct alleged" (internal quotation marks omitted)). So "[w]hile the [movants'] evidence may suggest some linkages between [Henríquez]'s murder and the drug conspiracy, . . . 'there are too many questions left unanswered concerning the link between the [d]efendant's federal offense and [the harm sustained by the movants as a result of Henríquez's apparent demise].'" In re Rendon Galvis, 564 F.3d at 175 (quoting Sharp, 463 F. Supp. 2d at 566). Their purported proof has demonstrated only "that there was a symbiotic relationship" between the defendant's conspiracy and Henríquez's death, which does not satisfy the causal standard under the CVRA. Id. at 175-76.

### III.   CONCLUSION

In sum, although Henríquez's apparent death was tragic and the Court sympathizes with the movants' loss, the Court must conclude that his death is too factually attenuated from the charged conspiracy for which the defendant was indicted, and pleaded guilty, and therefore, must deny the movants' request for victimhood status under the CVRA.[11]

---

[11] The movants represent that "the real import of [their] motion is to establish their right to participate . . . in the sentencing and any subsequent proceedings that may affect the [d]efendant's incarceration in the United States[] or elsewhere." Movants' Submission III at 8. The Court, in its discretion, will allow the movants an opportunity to be heard at the sentencing of the defendant. See 18 U.S.C. § 3661 (2012) ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); Roberts v. United States, 445 U.S. 552, 556 (1980) ("We reaffirm[ ] the fundamental sentencing principle that a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."). At this time, unless decided otherwise, the Court will limit the movants' opportunity to be heard to written submissions. Thus, if the movants decide to attend the defendant's sentencing, they will not be afforded the opportunity to be heard further, unless the court explicitly permits them to do so after considering their written submissions and any response by either the defendant or the government.

...

**SO ORDERED** on this 6th day, August 2015

Reggie B. Walton
United States District Judge

---

[12] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.